**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **JUAN LOZADA-LEONI,** | : | |
| Plaintiff, | : | |
| | : | **CASE NO.  5:19-cv-00011-RWS-CMS** |
| v. | : | |
| | : | |
| **MONEYGRAM INTERNATIONAL,** | : | **JURY TRIAL DEMANDED** |
| **INC., JUAN MANUEL GONZALEZ** | | |
| **and CHRISTOPHER PONDER in their** | : | |
| **official and individual capacities,** | | |
| **Defendants.** | : | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff JUAN LOZADA-LEONI ("Plaintiff" or "Lozada"), by and through his attorneys, Robert W. Weber and Steve Kardell, files this First Amended Complaint demanding trial by jury against MoneyGram International, Inc. ("MGI"), Juan Manuel Gonzalez ("Gonzalez") and Christopher Ponder ("Ponder") (referred to individually or collectively as "Defendants"), and hereby alleges as follows:

### JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

1.      Jurisdiction is conferred on this Court pursuant to 18 U.S.C. § 1514A *et seq* and 28 U.S.C. § 1331.

2.      Venue is proper in this district under 28 U.S.C. § 1391(a) because the acts that give rise to this Complaint, as well as certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws took place in this District.  MGI's principal place of business is in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

3.      Plaintiff timely filed a complaint with the United States Department of Labor. More than 180 days have elapsed since filing that complaint.[1] Plaintiff has therefore exhausted his administrative remedies.

## PARTIES

4.      Plaintiff began work as a Senior Manager for the U.S. Regional Compliance Team for MoneyGram International, Inc. on October 18, 2016.

5.      MGI is a money transfer company based in the United States with headquarters in Dallas, Texas.

6.      Gonzalez, at all relevant times, was a Senior Director for MGI's Regional Compliance for the Americas. Gonzalez worked for MGI at its headquarters located at 3000 Internet Blvd., Frisco, Texas. At all relevant times, Gonzalez had supervisory authority over Plaintiff.

7.      Defendant Ponder, at all relevant times, was the Director of Human Resources for MGI Compliance. Ponder worked for MGI at its headquarters located at 3000 Internet Blvd., Frisco, Texas. At all relevant times, Ponder had human resource authority over Plaintiff's terms and conditions of employment.

## FACTUAL ALLEGATIONS
### Overview

8.      This is a retaliation/termination case brought pursuant to Section 806 of the Sarbanes-Oxley Act ("SOX").

9.      The corporate Defendant, MGI, violated a number of federal statutes as well as

---

[1]      From March 5, 2018 to the date of filing the instant action herein, this matter was before DOL Administrative Law Judge Tracy Daly, bearing Cause No. 2018-SOX-0004.

government directives by failing to establish, implement and maintain comprehensive anti-fraud and anti-money laundering programs, failing to conduct due diligence on its agents, failing to adequately monitor, investigate and discipline its agents for significant breaches of its global compliance policy, and failing to ensure that its agents met their obligations to detect and prevent fraud, and money laundering, as outlined in both MGI's Agent's Global Partner Compliance Policy and government filings.

10.     Plaintiff raised complaints to management regarding MGI's continuing and willful violations of its policy, applicable laws and regulations as well as the government directives.  He was terminated for seeking to stop MGI's illegal acts.

11.     The individual Defendants are two managers to whom Plaintiff complained of MGI's violations and who were involved in Plaintiff's termination.

### The Government's Findings, Orders and Penalties against MGI

12.     On October 21, 2009, MGI entered a Stipulated Order with the Federal Trade Commission ("FTC").  The Order (the "2009 FTC Order") enjoined MGI from, among other things, failing to: establish, implement, and maintain a comprehensive anti-fraud program that was reasonably designed to protect US and Canadian consumers; conduct thorough due diligence on prospective agents and ensure its written agreements require agents to have effective anti-fraud policies and procedures in place; adequately monitor its agents[2] by, among other things, providing appropriate and ongoing training, recording all complaints, reviewing transaction activity, investigating agents, taking disciplinary actions against problematic agents, and ensuring that its

---

[2]     The definition of the term "agent" includes any party entering into a contractual relationship with MGI or its subsidiaries and affiliates for the purposes of providing MGI's products and services to consumers. This definition also includes all subagents of an agent.

agents were aware of their obligations to detect and prevent fraud and comply with MGI's policies and procedures.[3]

13.     On November 9, 2012, MGI entered a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice ("DOJ").  In the DPA, MGI admitted to criminally aiding and abetting wire fraud and failing to maintain an effective anti-money laundering program.

14.     According to the DOJ November 9, 2012 press release ("DOJ 2012nPress Release"),[4] MGI was involved in mass marketing and consumer fraud phishing schemes, perpetrated by corrupt MGI agents and others, that defrauded tens of thousands of victims in the United States.  MGI also failed to maintain an effective anti-money laundering program in violation of the Bank Secrecy Act ("BSA").[5]

15.     On November 8, 2018, the DOJ levied a substantial fine against MGI and entered into an Amendment and Extension of Deferred Prosecution Agreement ("Amended DPA") with MGI.  The Amended DPA extended the DPA entered on November 9, 2012.[6]

16.     According to the Amended DPA, MGI was found to have:

- Failed to successfully complete the implementation of the enhanced compliance requirements of the DPA;

---

[3]     *FTC v. MoneyGram International, Inc.,* Civil Action No. 09-cv-6575 (N.D.Ill.)(Oct. 19, 2009).

[4]     Department of Justice, Office of Public Affairs, Press Release No. 12-1336, *MoneyGram International Inc. Admits Anti-Money Laundering and Wire Fraud Violations, Forfeits $100 Million in Deferred Prosecution* (Nov. 9, 2012)("DOJ 2012 Press Release"), https://www.justice.gov/opa/pr/moneygram-international-inc-admits-anti-money-laundering-and-wire-fraud-violations-forfeits.

[5]     The BSA requires U.S. financial institutions to collaborate with the U.S. government in cases of suspected money laundering and fraud.  The purpose of the BSA, aside from making money laundering more difficult to propagate, is to prevent banks from becoming unknowing intermediaries in illicit activity.  The BSA also requires banks to report suspicious activity that might indicate possible money laundering or fraud.  An activity is considered to be suspicious if it involves $5,000 or more in funds or assets that the financial institution suspects may indicate profit from illegal activity or transacted in order to hide illegal activity.  Aside from financial institutions such as banks and brokers, a variety of other institutions are required to report suspicious activity under the BSA, including businesses that issue or redeem money orders, such as MGI.

[6]     United States v. MoneyGram International, No. 1:12-cr-291, Amendment to and Extension of Deferred Prosecution Agreement (M.D.Pa filed 11/08/18).

- Failed, between April 2015 and October 2016, to block a substantial number of transactions associated with consumers that MGI previously had identified as receiving fraud transactions;
- Known that the newly-implemented fraud interdiction system was ineffective and failed to adequately remediate this failure until October 2016, and
- Failed to adequately disclose the weaknesses in the fraud interdiction system to the DOJ.[7]

17.     Under the extended terms of the Amended DPA, MGI agreed to additional compliance obligations, including the appointment of an independent compliance Monitor (the "Monitor"), and DOJ agreed to continue to defer prosecution for a period of 30 months.

18.     In a related case, MGI agreed to settle allegations made by the FTC alleging that MGI violated the 2009 FTC Order.

19.     The FTC alleged that MGI failed to implement the comprehensive fraud-prevention program required by the 2009 order, which required MGI "to promptly investigate, restrict, suspend, and terminate high-fraud agents."[8]

20.     Pursuant to the FTC allegations, "[MGI] was aware for years of the high levels of fraud and suspicious activities involving certain agents, including large chain agents, but failed to promptly conduct required reviews or suspend or terminate agents, as required by the 2009 order."[9]

21.     In settlement of the FTC allegations, MGI agreed to an expanded and modified order, superseding the FTC 2009 Order and applying to money transfers worldwide.

---

[7]     *Id*; Department of Justice, Office of Public Affairs, Justice News, *MoneyGram International Inc Agrees to Extend Deferred Prosecution Agreement, Forfeits $125 Million in Settlement with Justice Department and Federal Trade Commission,* (November 8, 2018), https://www.justice.gov/opa/pr/moneygram-international-inc-agrees-extend-deferred-prosecution-agreement-forfeits 125-million.

[8]     DOJ Press Release at 2.

[9]     Federal Trade Commission, Press Release, *MoneyGram Agrees to Pay $125 Million to Settle Allegations that the Company Violated the FTC's 2009 Order and Breached a 2012 DOJ Deferred Prosecution Agreement*, (November     8,     2018)     ("FTC     Press     Release"),     https://www.ftc.gov/news-events/press-releases/2018/11/moneygram-agrees-pay-125-million-settle-allegations-company.

22.     The Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction ("Modified FTC Order")[10] required that MGI block money transfers of known perpetrators of fraud schemes and provide refunds to fraud victims and enhanced due diligence, investigative and disciplinary requirements.[11]

23.     While the Amended DPA and the Modified FTC Order did not single out any one of MGI's agents, they identified a wide range of systemic, illegal conduct that forms the basis for the Amended DPA.  This was the same conduct that Plaintiff began complaining about almost immediately after he was hired at MGI, e.g., insufficient transaction analysis; insufficient suspicious activity reports ("SARs"); insufficient oversight of minority owned stores; failure to conduct independent reviews, and breakdown of the fraud interdiction system, specifically the Individual Watch List ("IWL") program.

24.     This illegal conduct by MGI continued during Plaintiff's tenure at MGI.

**During Plaintiff's Tenure at MGI, MGI Had Knowledge of, Yet Ignored, Suspicious Activities of its Largest Agents**

25.     Plaintiff began work at MGI in mid-October 2016.  As Senior Manager for the U.S. Regional Compliance Team, Plaintiff was responsible for supervising Defendant MGI's regional compliance officers (RCOs), senior regional compliance officers (Sr. RCOs) and managers on the United States team.

26.     Plaintiff's direct reports were responsible for measuring agents' anti-fraud and anti-money laundering compliance programs and assisting in agent training and deficiency remediation to these agents' compliance programs.

---

[10]     FTC v. MoneyGram International, Inc., Civil Action No. 09-cv-6576, Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction (N.D. Ill. Nov. 8, 2018).

[11]     *Id.*

27.     Plaintiff also was responsible for monitoring MGI's agents' implementation of MGI's Global Partner Compliance Policy, which contained MGI's anti-fraud and anti-money laundering policies and procedures.

28.     Plaintiff worked under the direction of Juan Manuel Gonzalez.

29.     During Plaintiff's entire tenure at MGI, MGI was operating under the requirements of the Amended DPA and the Modified FTC Order.

30.     During Plaintiff's tenure, MGI had knowledge of, yet ignored, suspicious activities of several of its largest agents, including Wal-Mart, Schnucks, SuperValu, RaceTrac, Valero and CVS.

31.     MGI knew of the suspicious activities by virtue of annual on-site regional compliance reviews of all of its large agents.  These reviews were conducted by MGI's Sr. RCOs. The findings of the Sr. RCOs' reviews were recorded in reports called Review Worksheets, Super Agent (Headquarter) Review – Enhanced Due Diligence Program Review (hereafter "Agent Review Worksheets").

32.     These Agent Review Worksheets indicated problems such as: failure of the agents to file SARs reports, failure of the agents to conduct required monitoring and analysis, failure of agent to verify customer's identity, failure of agents to implement transaction monitoring designed to detect suspicious activity and failure of the agents to have an account with the Financial Crimes Enforcement Network ("FinCEN").[12]

33.     Agent Review Worksheets were kept on file by MGI.

34.     At the end of the annual review, the agent received two documents from the Sr.

---

[12]   FinCEN is a bureau of the U.S. Treasury Department that collects and analyzes information about financial transactions in order to combat domestic and international money laundering, terrorist financing, and other financial crimes.

RCO: one, somewhat similar to a report card, was called an "AML/Fraud Compliance Review Report," and the other, somewhat similar to a "to-do" list, was called an "Acknowledgement Form." The Acknowledgement Form was then signed by the agent's Sr. RCO or its compliance department representative and returned to MGI.

35.    While MGI often would ignore violations cited in the Agent Review Worksheets that MGI prepared for its large chain agents, such as Wal-Mart, Schnucks, SuperValu, RaceTrac, Valero and CVS, it almost always disciplined the smaller "Mom and Pop" agents for the violations cited in their Agent Review Worksheets.

36.    Agents that continued to ignore the violations cited in their Agent Review Worksheets continued to violate the DPA, the 2009 FTC Order and the BSA.

**Plaintiff Began to Notice Problems in MGI's Compliance Department**

37.    Shortly after starting his position at MGI, Plaintiff began observing significant flaws with the way in which MGI was implementing and enforcing its anti-fraud and anti-money laundering policies, particularly when it involved large agents of MGI.

**Plaintiff Witnessed Compliance Infractions at Wal-Mart**

38.    During Plaintiff's third week on the job, MGI welcomed to its office in Frisco, Texas three senior compliance representatives from Walmart, MGI's largest account.

39.    The meetings with the Walmart team occurred over two days.  MGI had a representative from each of its compliance sections present at the meetings, and the Walmart team was given an overview of MGI's global compliance program.

40.    At the end of the first day of meetings with Walmart, Plaintiff witnessed an exchange that raised some red flags.  The exchange occurred when Gonzalez and a group of his subordinates were walking to their respective assigned work spaces.  Eli Morillo ("Morillo"),

MGI's VP of Global AML Compliance, stopped Gonzalez in the hall.  Morillo asked Gonzalez if he had informed the Monitor's team about MGI's meeting with Walmart.

41.     To Plaintiff's surprise, Gonzalez started laughing and bragged to Morillo that he had hoodwinked the Monitor by excluding the Monitor from the meeting with Wal-Mart. Gonzalez told Morillo that he had not told the Monitor about the Wal-Mart meeting because he did not want the Monitor's team in his business.  Plaintiff was shocked at this response.  Plaintiff wondered about the message that Gonzalez, as the Head of Regional Compliance for the Americas, was sending to his team.  Plaintiff questioned how MGI could build a culture of compliance if the head of its compliance program kept information from its Monitor and then bragged about it.

42.     Plaintiff also noticed how close Gonzalez was with the senior sales managers who oversaw the larger accounts.  Gonzalez asked his direct reports to get permission from those senior sales managers before implementing anti-fraud measures, also known as system rules, into the network.

43.     The exchange between Gonzalez and Morillo was the first indication to Plaintiff that something was not right in the MGI compliance department. As Plaintiff earned more about the intricacies of his position, Plaintiff noticed some significant discrepancies between the image that MGI presented to its external stake-holders about the effectiveness of its compliance program and the reality on the ground.

44.     In addition, the technology that MGI was using was so outdated that it was becoming increasingly clear to Plaintiff that MGI simply did not have the technology to run an effective compliance program as required by the DPA and 2009 FTC Order.

**Plaintiff Witnessed Compliance Infractions at Schnucks**

45.     In or about February 2017, Plaintiff received an email from Pam Mueller ("Mueller"), the compliance contact for Schnucks Supermarkets.  In her email to Plaintiff, Mueller complained about a known fraudster that continued to use MGI to defraud the agent's customers even when she had reported the name to MGI and asked that the agent be blocked. She asked why the agent had not been blocked and inquired as to whether her requests to have MGI partner in helping to eliminate wire transfer fraud in her stores was going to be honored.

46.     In or about February 2017, Sheryl Stanhope, the store auditor from Schnuck's wrote an email message informing MGI Compliance that MGI was not honoring a block request and, as a result, fraudsters continued to use Schnuck's to defraud customers.

47.     Kristi Diehl ("Diehl"), the VP of Global Compliance Enhancement Program and Technology Projects, managed a large team that was the target of constant criticism within compliance for its lack of effectiveness and inability to fix significant problems. Plaintiff recalls having a frank discussion with Diehl about the IWL program in January 2017.  Plaintiff's conversation with Diehl was cordial but not very productive.  Diehl told Plaintiff that IWL should be working and that Plaintiff needed to meet with his team to determine why it had failed for Schnucks.

48.     That same week, Plaintiff met with Craig Bernier, the Head of Compliance Monitoring (Financial Intelligence Unit), and Bernier told Plaintiff that he was aware of the problem and that he also was frustrated with the lack of a solution.

49.     About one month later, Plaintiff had a conversation that caused him further concern. Ana Duenas Arias, MGI's Risk Assessment Manager (Analytics Compliance) told Plaintiff that she knew that MGI's IWL was a mess and that she had been forced to bypass her supervisor and

go straight to senior management to implement a smaller "fraud intersect" program that could help to catch some of these known fraudsters.  She also told Plaintiff that while implementing that program she had discovered that 3,000 names had been entered incorrectly in to the IWL system by Diehl's team and that nobody had discovered the error until she pointed it out months later. This meant that 3,000 known fraudsters continued to transact business because of Diehl's error and nobody caught the problem for months.

50.     MGI continued to turn a blind eye to ongoing violations of the DPA, the 2009 FTC Order, and the BSA.

**Plaintiff Witnessed Compliance Infractions at CVS**

51.     In or about 2017, I shadowed Pablo Rivera ("Rivera"), MGI's Senior RCO in charge of the CVS account.  I saw that Rivera knew firsthand the irregularities that occurred at CVS stores because of a lack of proper reporting.

52.     I saw that Rivera experienced significant problems reviewing some CVS stores, namely that managers of the stores were often combative and poorly trained in compliance matters.

53.     Rivera noticed how CVS stores failed to follow their own procedure and often failed to mail compliance related documents for storage to the HQ.

54.     Rivera and I attended meetings where MGI sales managers would talk CVS representatives out of implementing measures that would lower fraud.

55.     Plaintiff Notified MGI Management of its Compliance Infractions, but to no avail.

56.     Plaintiff wrote to Gonzalez about his concerns about the compliance infractions that he had witnessed, but Gonzalez often ignored Plaintiff's emails.  When Plaintiff told Gonzalez about the problems over the phone, Gonzalez told Plaintiff that he would look into them, but Plaintiff never hear back from Gonzalez.

57.    Plaintiff also brought his concerns regarding MGI's compliance infractions to the attention of Ponder, the Director of Human Resources for the Compliance Department of MGI. Ponder refused to investigate Plaintiff's claims of ethical violations on the part of Gonzalez, and subsequently criticized Plaintiff for his lack of deference to Gonzalez.

58.    Plaintiff was amazed that despite the fact that many senior people in compliance knew about MGI's compliance problems, they continued to give a misleading presentation to agent representatives that visited the Frisco office.

59.    Plaintiff learned that the year-end bonuses received by most senior managers and directors in MGI's compliance department were based on MGI meeting its revenue targets.  It was clear to Plaintiff that MGI's compliance decisions were compromised by its revenue interests.[13]

60.    Over and over again, senior employees at MGI portrayed an image that completely misrepresented MGI's compliance program and bragged about the effectiveness of MGI's IWL, even though they knew it was false.

61.    Plaintiff began to tell some of MGI's agents that MGI's IWL was not perfect and that the agents needed to partner with MGI to mitigate fraud until MGI's technology could combat the fraud on its own.   Gonzalez became very upset at this; he wanted Plaintiff to leave those comments out of his presentations, even when Plaintiff expressed concerns that agents may not have been watching for the names on the IWL if they believed MGI had resolved the issue and blocked the fraudsters in its system.

62.    Whenever Plaintiff mentioned a problem with MGI's compliance program to Gonzalez, Gonzalez either ignored Plaintiff or became frustrated.

---

[13] Indeed, the DOJ itself had concluded that "MoneyGram's broken corporate culture led the company to privilege profits over everything else."  DOJ 2012 Press Release.

63.     The compliance issues raised by Plaintiff were raised shortly before the DPA was to expire and while MGI was in the process of gaining approval for a merger with Ant Financial, a Chinese company, that had pushed MGI stock to some of its highest valuation in years.

64.     Upon information and belief, MGI wanted to get out from under the DPA because its existence was negatively affecting MGI's stock price and could potentially have affected the Ant Financial merger.

65.     MGI, therefore, concealed its ongoing infractions of the DPA, the FTC Order and the BSA for its own gain.

### MGI Intentionally Hid its Compliance Program's Flaws from the Monitor To Appear to Comply with the DPA

66.     An example of MGI hiding its compliance problems from the Monitor occurred in or about December 2016.  Plaintiff was placed in charge of revamping the RCT's financial institutions' review program.  It had been years since MGI last reviewed most of the high-risk financial institutions, and the Monitor specifically rebuked MGI about this issue.  Plaintiff selected an RCO to help him run the program and they started to meet with the internal stake-holders.

67.     Many of the financial institutions that served as MGI agents were governed by "evergreen" contracts that self-renewed every few years.  This meant that most of the contracts were old contracts and did not contain the language that would allow MGI to demand that its financial institution agents comply with its global-partner compliance policy.

68.     Most RCOs complained to Plaintiff that banks were unresponsive and often claimed that they did not have a duty to provide information about their compliance program to MGI.

69.     Plaintiff raised this concerned with Gonzalez.  Gonzalez told Plaintiff that this was a problem, but it was not their problem.  He asked Plaintiff to attend a meeting with the Monitor to assure the Monitor that MGI had already scheduled reviews for high-risk financial institutions

and planned to review all financial institutions that appeared in the ARM (agent risk model) for that cycle.  As directed, Plaintiff attended a meeting with a member of the Monitor's team and told him that MGI was on track to meet its commitments with the financial institutions.  Two days later, however, Gonzalez told Plaintiff to scratch his plan to review financial institutions.  Plaintiff asked for permission to tell the Monitor about the change of plans, but Gonzalez told Plaintiff that he did not want Plaintiff to do that and that it was not necessary.

70.     MGI enforced a hiring freeze from November 2016 to January 2017.  During that time, over one-third of the Regional Compliance Team ("RCT") positions in the U.S. remained vacant, and the RCT remained seriously understaffed.  Plaintiff became convinced that the main goal of MGI was to cut expenses, even if that meant hiding the program's flaws from the Monitor, MGI's own partner agents and its investors.

71.     In one particular meeting in January or February 2017, Gonzalez told members of the RCT to not put compliance deficiencies in writing but, instead, to pick up the phone and call their colleagues to avoid creating a paper trail. Gonzalez reminded the RCT that the Monitor would use key words to search all emails sent within compliance, and that MGI wanted to avoid having to explain an email to the Monitor.

72.     Most concerning, Gonzalez told the members of the Latin America RCT to distort or "shape" the message in MGI's favor whenever they were being shadowed by members of the Monitor's team who were not significantly proficient in Spanish. Plaintiff was so concerned about what Gonzalez had said that he called a meeting with his team to clarify that everyone should be transparent with the Monitor's team and that nobody should be shaping the message or misrepresenting anything to the Monitor's team.

73.     Another example of MGI hiding its compliance problems from the Monitor occurred during a conference in Miami, where Plaintiff was to give a presentation to the RCT team about the DPA.   One of the attorneys assigned to the Monitor's team, Phil Underwood ("Underwood"), attended the conference.   Plaintiff took advantage of this opportunity to raise some of his concerns with Underwood. Gonzalez saw Plaintiff talking to Underwood and became concerned.  He questioned Plaintiff about the content of his conversation with Underwood and told Plaintiff to report to him about any further conversations.

74.     Peter Green, MGI's Head of Regional Compliance for the Americas and Europe, also saw Plaintiff speaking to Underwood and asked Plaintiff what their conversation entailed.

75.     While Plaintiff was in Miami, he received a message from Eddie Ponce, one of MGI's compliance directors.   Ponce was worried about a strategic account assigned to one of Plaintiff's direct reports because the fraud rates of the agent were higher than normal.  Plaintiff spoke to Derya White and Gonzalez about this.  Gonzalez became upset that Ponce was interfering with "his business."  When White left the meeting, Gonzalez told Plaintiff to withhold from Ponce any information about Supervalu, the agent in question.

76.     Just minutes before Plaintiff began his presentation about the DPA, Gonzalez ordered Plaintiff to erase some of the slides in his presentation.  Gonzalez told Plaintiff that he did not want the Monitor seeing the information contained in those slides.

77.     Plaintiff again was amazed by how senior leaders in MGI compliance were working hard to ensure that the Monitor was kept in the dark.  This was clearly not a Gonzalez issue alone; Plaintiff had seen attorneys from MGI attend a meeting where Gonzalez told RCT team members not to communicate with other members of the team about compliance deficiencies in writing.

Instead, Gonzalez encouraged RCT members to pick up the phone and "shape the message" to the Monitor whenever they could.

**Plaintiff Witnessed Compliance Infractions at SuperValu**

78.     Weeks after the Miami conference, Plaintiff traveled to Minneapolis to conduct a Headquarters review of Supervalu, the large Minnesota-based grocery chain.

79.     Plaintiff was worried about SuperValu's consistently high fraud rates and wanted to learn why it was struggling to bring its fraud problem under control. During the review, Plaintiff learned that there were a number of minority-owned stores that Supervalu did not track for compliance purposes. Plaintiff learned about this when he heard White mention to the compliance contact for Supervalu that one of the SuperValu locations on which she had conducted a transaction analysis showed high levels of fraud and activity consistent with money laundering. When the Supervalu compliance contact told Plaintiff and White about the lack of oversight, Plaintiff asked some follow-up questions.

80.     What transpired over the next few days convinced Plaintiff that MGI was not willing to compromise its business relationship with a large agent in order to force the agent to comply with its compliance obligations.   In the case of Supervalu, SuperValu actually was rewarded with production bonuses for meeting its targets.  Once again, MGI chose profits over the safety of its customers and consumers.

81.     Plaintiff learned that in addition to allowing stores to operate without compliance supervision from headquarters, Supervalu also had failed to conduct an independent review of its compliance program for years and had allowed its stores to continue operating even when their transaction monitoring was not designed to detect suspicious activity (a basic cornerstone of any working compliance program).  In fact, many of the deficiencies of SuperValu's program noted

by White over the past three years had not been addressed. White acknowledged that large agents were often allowed to operate under a type of "honor system," and that once she handed the agents an Agent Review Worksheet showing SuperValu's compliance deficiencies, she trusted that the agents would do the right thing.

82.     Plaintiff, concerned that other strategic accounts assigned to him had the same problems as SuperValu, sent an email message to Gonzalez that same night.  Plaintiff asked Gonzalez for permission to conduct headquarter reviews of all large accounts assigned to him. Gonzalez did not answer that email but did call a meeting with Plaintiff the next day.

**Plaintiff Was Retaliated Against for his Complaints about MGI's Illegal Conduct**

83.     Gonzalez was frustrated with Plaintiff for sending him the email about Supervalu. When Plaintiff asked his permission to suspend the minority-owned stores until MGI could determine who owned them, Gonzalez refused. Gonzalez told Plaintiff that he would not suspend the stores because he did not want MGI to lose its customers to the competition.  Plaintiff responded that Gonzalez's decision to allow these stores to continue to operate was completely contrary to everything Plaintiff had learned about MGI's written policies and appeared to violate the law.  Nonetheless, Gonzalez continued to hide MGI's compliance issues.

84.     Plaintiff was concerned that Gonzalez's decision was a violation of the BSA and told Gonzalez this.  Plaintiff also told Gonzalez that this issue needed to be brought to MGI's legal department, but Gonzalez ignored Plaintiff's recommendation.

85.     Plaintiff approached the legal department a few days later and was told that Gonzalez's decision was troubling by Leah Carlisle Pfeifer, an attorney with MGI.

86.     Four days after Plaintiff's conversation with MGI's legal department, Gonzalez called Plaintiff and told him that he could not believe that Plaintiff had gone to the legal department

behind his back and that he did not think that Plaintiff could continue to work as one of his managers anymore. Plaintiff was stunned. A few days after this phone conversation, Plaintiff was fired.

### The DPA Was Amended, the FTC Order Was Modified, and Both Specifically Addressed the Compliance Violations Cited by Plaintiff

87.     Approximately 18 months after Plaintiff was terminated, MGI was found to have violated the 2009 FTC Order and was hit with massive new fines and sanctions, along with the brand-new Amended DPA.

88.     These new sanctions incorporated and adopted the following complaints that Plaintiff had been terminated for raising:

- Plaintiff's complaints regarding MGI's violation of laws and regulations,    including violations of the BSA, the Patriot Act, consumer fraud protections    and money laundering statutes;

- Plaintiff's complaints regarding MGI's willful violations of the 2009 FTC Order, and

- Plaintiff's complaints regarding MGI's willful violations of the DPA.

| Government Findings: | Continued Violations Raised by Plaintiff and Known to MGI: |
|---|---|
|  | **SuperValu** |
| "MoneyGram was aware … of suspicious activities involving certain agents…but failed to promptly conduct required reviews or terminate agents."  (2009 FTC Order) | Plaintiff learned from White and her team, representing and acting on behalf of MGI, that:<br><br>1.  SuperValu had done insufficient transaction analyses;<br>2.  SuperValu filed insufficient SARs (for its size and fraud rate);<br>3.  SuperValu conducted insufficient oversight of minority-owned stores; |

MGI experienced "continued weaknesses in [MGI's] anti-money laundering …and anti-fraud programs."  (DPA ¶1.a.)

"Failure by [MGI] to block a substantial number of transactions associated with consumers MGI previously identified as receiving fraud transactions."  (DPA ¶1.b.)

MGI knew its "fraud interdiction system was ineffective and [failed] to remediate this failure." (DPA ¶1.c.)

"MGI inadequately disclosed "the weaknesses in the fraud interdiction system to the [DOJ]." (DPA ¶1.d.)

4.  SuperValu failed to conduct independent reviews; and
5.  there was a breakdown of SuperValu's fraud interdiction system, specifically the IWL.

**Wal-Mart**

1.  Plaintiff overheard Gonzalez telling Morillo that he had not disclosed the Wal-Mart meeting to the Monitor because he did not want the Monitor "in his business."
2.  MGI personnel was often poorly trained and very rarely conducted transaction monitoring and analysis;
3.  MGI treated Wal-Mart, the largest agent of MGI, favorably and did not suspend Wal-Mart stores in instances where it should have.

**Schnucks**

1.  Pam Mueller, Schnuck's assigned Compliance representative, sent Plaintiff an email accusing MGI of failing to block fraudsters;
2.  Mueller also complained about the breakdown of Schnuck's fraud interdiction system, specifically the IWL;
3.  Sheryl Stanhope, the store auditor from Schnuck's, wrote a message informing MGI that it was not honoring her block request and, as a result, fraudsters continued to use Schnucks to defraud others

**CVS**
Plaintiff learned from shadowing Pablo Rivera, MGI's Senior RCO in charge of the CVS account, representing and acting on behalf of MGI, that:

|  | 1. There were irregularities with CVS stores caused by a lack of proper reporting.
2. Rivera experienced significant problems reviewing some CVS stores, managers of the stores were often combative and poorly trained about compliance.
3. CVS stores failed to follow their own procedure and often failed to mail compliance related documents for storage to the HQ.
4. Rivera attended meetings where MGI sales managers would talk CVS representatives out of implementing measures that would lower fraud. |
| --- | --- |

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Sarbanes-Oxley Act - 18 USC § 1514A)

89.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

90.     As set forth above, Defendants violated the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A, by taking adverse employment actions against Plaintiff, including, but not limited to, termination and other forms of retaliation, because of his protected conduct under 18 U.S.C. 1514A.

91.     As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer severe financial, mental and emotional hardship and injury including the loss of compensation, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorney's fees, costs and disbursements.

**RELIEF SOUGHT**

WHEREFORE, as a prevailing SOX whistleblower is entitled to "all relief necessary to

make the employee whole," Plaintiff requests the following relief:

- Back pay (lost wages and benefits);
- Reinstatement with the same seniority that the employee would have had, were it not for the retaliation;
- Alternatively; front pay in lieu of reinstatement;
- Special damages (damages for impairment of reputation, personal humiliation, mental anguish and suffering, and other noneconomic harm that results from retaliation), and
- Attorney's fees, and costs.


DATED:  March 20, 2019                    Respectfully submitted,


By:   */s/ Robert W. Weber*
      **Robert W. Weber,** *Local Counsel*
      Texas State Bar No. 21044800
      E-mail: bweber@smithweber.com

      SMITH WEBER, L.L.P.
      5505 Plaza Drive
      Texarkana, Texas 75503
      Telephone:  903-223-5656
      Facsimile:  903-223-5652


      */s/ Steve Kardell*
      **Steve Kardell**
      Texas State Bar No. 11098400
      E-mail: skardell@kardelllawgroup.com

      **KARDELL LAW GROUP**
      4514 Cole Avenue, Suite 600
      Dallas, Texas 75205
      Telephone: (214) 616-4654
      Facsimile: (469) 729-9926

      **ATTORNEYS FOR PLAINTIFF,**
      **JUAN LOZADA-LEONI**